UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF NEW YORK
_____

DANNY CLARK,

                    Petitioner,                    **DECISION AND ORDER**

          -vs-                                      No. 04-CV-6525(VEB)

SUPERINTENDENT POOLE,

                    Respondent.

_____

## INTRODUCTION

Petitioner, Danny Clark ("Clark" or "petitioner"), filed this *pro se* petition for a writ of

habeas corpus pursuant to 28 U.S.C. § 2254 challenging his conviction in Monroe County Court

after a jury trial on charges of robbery in the first and second degrees (N.Y. Penal Law §

160.15(4); § 160.10(1)) and kidnaping in the second degree (N.Y. Penal Law § 135.20). The

parties have consented to disposition of this matter by the undersigned pursuant to 28 U.S.C. §

636(c).

## FACTUAL BACKGROUND AND PROCEDURAL HISTORY

Clark's conviction stems from his involvement, with Pedro Miranda ("Miranda"),

Clifford Ball, Jr. ("Ball"), and Hoyt Newton ("Newton"), in the abduction of Robert Liriano

("Liriano" or "the victim") on the night of March 28, 2002, in the City of Rochester. Clark was

charged by Monroe County Indictment 02-0325 with robbery in the first and second degrees

(N.Y. Penal Law § 160.15(4); § 160.10(1)), kidnaping in the second degree (N.Y. Penal Law §

135.20), and criminal possession of a weapon in the second degree (N.Y. Penal Law §

265.03(2)). Prior to a suppression hearing, the prosecution offered Clark the opportunity to plead

-1-

guilty to the "top count" of the indictment and receive a sentence promise of three and one-half years. Clark rejected this offer. Following the suppression hearing, Monroe County Court (Geraci, J.), determined that the police had probable cause to arrest all of the defendants. Just after the commencement of jury selection, Clark, through counsel, indicated that he wished to plead guilty. However, based on Clark's statement that he did not know what was going on during the purported crime, the trial court stated, "We can't do a plea." Following jury selection, a plea offer again was extended to Clark (attempted first degree robbery with a sentence promise of three and one-half years, along with a period of post-release supervision). The trial court was not satisfied with Clark's plea allocution, however, and a guilty plea was not entered. Clark was tried jointly with co-defendant Ball. Co-defendant Miranda testified for the prosecution at their trial.

At trial, Valerie Sapp ("Sapp") testified that just after midnight on March 28, 2002, she noticed two cars proceeding down Campbell Street in the City of Rochester at a high rate of speed. She saw four men exit the cars and go into the back of a house on Campbell Street which she knew to be unoccupied. According to Sapp, the men appeared to be carrying something; she heard them whisper, "Go! Go! Go!" or words to that effect. This prompted Sapp to call the police.

Within minutes, officers from the Rochester Police Department arrived at the scene and saw that lights appeared to be on in a first-floor room of the house. After the first officer knocked on the front door, the light was extinguished and nobody answered the door. Several minutes later, Clark jumped out of a first-floor window. Upon seeing a police officer standing near the front of the house, Clark turned and began to walk toward the rear of the house. After being

ordered by the officer to come to the front of the house, Clark explained that he had been

kidnaped at gunpoint by several men who were inside the house. During a pat-down of Clark, the

police recovered a pager, a pocket knife, and a set of car keys to a car that was parked in front of

the house.

Soon thereafter, the victim, Liriano, ran out the front door in his underwear; he was

yelling and he exhibited some lacerations on his head and face. The police then entered the

house and discovered the other perpetrators inside.

According to Liriano, on the night the abduction, he drove to his girlfriend's house on

Frankfort Street. As he returned to his car after finding that no one was home, Liriano was

accosted by several men wielding guns. The men removed Liriano's clothing, boots, jacket,

bracelet and car keys, leaving him clad only in his socks and underwear. They placed him in his

car, and a Hispanic man with a gun began to hit him on the head with a pistol. They duct-taped

his hands and legs and blindfolded him with a knit hat. Liriano related that the men appeared to

be communicating via walkie-talkie. Liriano recalled that the two Hispanic assailants each had a

gun.

The captors transported Liriano to 351 Campbell Street and threw him down on the floor,

demanding drugs and money from him. Liriano insisted that he had neither, and the one of the

men shouted that the police had arrived. Liriano testified that he identified Clark when the knit

hat was removed from his head at 351 Campbell Street. Liriano also stated that he identified

Clark when he was first accosted on Frankfort Street. According to Liriano, he noticed that his

pager was missing after the incident.

Co-defendant Miranda testified for the prosecution after pleading guilty to attempted first

degree robbery and receiving a sentence promise of a determinate term of five years. Miranda testified that he and a man named "Mercado" (Geraldo Martinez) planned to rob a group of Dominican drug dealers, of whom Liriano was a reputed member. According to Miranda, Mercado had been dealing with Liriano and his fellow Dominicans for a "couple years." An eight-thousand-dollar drug deal was set up for March 28, 2002.

Miranda testified that he and Ball, another co-defendant, purchased duct tape and tie wraps to prepare for the abduction and robbery. On the night of the incident, Clark happened to be over at Miranda's house during the preparations for the abduction. Miranda asked him if he wanted to make some money by participating in the scheme; Clark responded affirmatively. Later that night, co-defendants Newton and Ball arrived at Miranda's house in a Chevrolet Impala. Miranda testified that he and his cohorts rode in two separate cars (Clark's Subaru and the Impala) and used walkie-talkies to communicate. They followed Liriano to his girlfriend's house on Frankfort Street. Ball and Newton hid in the bushes outside. Miranda testified that he brought a .38-caliber revolver; Newton had a semi-automatic gun.

While they were waiting for the victim to appear, Miranda testified that Clark was playing with the .38-caliber revolver in the car. As Liriano came into view, Mercado grabbed the .38-caliber revolver from Clark, exited the Subaru, struck Liriano in the head with the gun, ordered him to get on the ground, and took his keys. Ball and Newton then emerged from the bushes and grabbed Liriano. According to Miranda, Ball, Newton and Clark all participated in placing Liriano into his car, a Ford Thunderbird.

Newton drove the Thunderbird (with passengers Liriano and Miranda) to the address on Campbell Street; the rest of the perpetrators followed in the Subaru and the Impala. Once they

-4-

arrived at 351 Campbell Street, Miranda, Newton and Clark escorted Liriano into the house. Mercado, who was already there, let them in through the front door. Miranda testified that Mercado did not know what was going on and that he was innocent; he conceded that Mercado had pleaded guilty to being involved in the crime but maintained that he need not have done so.

Miranda related that Liriano was taken to a bedroom where he was bound with more duct tape and placed on the floor. Miranda then got on top of him and interrogated him about the location of his drugs and money. Liriano informed them of a house on Joseph Avenue that had "two kilos" stashed in the wall and $10,300 in cash. At about that time, Miranda testified, the police arrived on the scene. Miranda freed Liriano, who fled. Miranda stated that he concealed himself in a rolled-up carpet where a police dog later found him.

The police recovered Liriano's identification in a kitchen cabinet at Campbell Street. Both handguns used during the crime were recovered at Campbell Street as well. However, no physical evidence was found at the Frankfort Street crime scene, and the walkie talkies were not found.

Co-defendant Ball testified for the defense that on the night of the incident, he drove over to 351 Campbell Street in his Impala with Newton. When they arrived, Clark and a woman whom he knew as "Neesh" were already there watching television. Eventually, Neesh left, leaving Clark, Ball, and Newton at the house. Ball testified that he subsequently heard people on the porch. The door opened, and Miranda (whom he had never met before) entered with two other men, one of whom was in his underwear. According to Ball, Miranda was wielding a gun. Miranda ordered Ball, Newton and Clark to be quiet. Soon thereafter, the police arrived, and the man in his underwear (*i.e.*, Liriano) ran out of the house. Ball testified that he had never seen

Liriano before and that he had nothing to do with the crimes allegedly committed that night.

The jury returned a verdict convicting Clark and Ball as charged in the indictment. Clark was sentenced to a determinate term of imprisonment of fifteen years, along with a five-year period of post-release supervision on each count of the indictment.

On direct appeal, the Appellate Division, Fourth Department, of New York State Supreme Court affirmed Clark's convictions on the charges of robbery and kidnaping, but reversed his conviction on the weapons possession charge, holding that it was possible that Clark had been convicted of an unindicted crime since the prosecution presented proof that Clark, as either a principal or an accomplice, possessed two different firearms. However, Clark had been indicted for possession of only one, and nothing in the bill of particulars or the jury instructions given by the trial court specified which firearm defendant was alleged to have possessed. *People v. Clark*, 6 A.D.3d 1066, 776 N.Y.S.2d 656 (App. Div. 4th Dept. 2004). The majority also held that the concurrent, determinate terms of incarceration imposed on the remaining counts of the indictment should be reduced to [years] as a matter of discretion in the interest of justice since Clark had no prior felony convictions and no history of violent crime. The appellate court noted that Clark had been offered a sentence of a determinate term of incarceration of three and one-half years as part of a plea bargain, while Miranda, the co-defendant who "masterminded" the criminal acts and who also had a "long history" of violent crimes and felony convictions, was sentenced to a term of incarceration of only five years as a result of his cooperation with the prosecution. *Id.* The dissent voted to uphold the sentence imposed of fifteen years on the basis that it was not unduly harsh or severe. *Id.* (dissenting opn.). The New York Court of Appeals denied leave to appeal. *People v. Clark*, 3 N.Y.3d 638, 816 N.E.2d 199, 782 N.Y.S.2d 409 (N.Y.

2004).

This habeas petition followed in which Clark raises the following grounds for relief: (1) trial counsel was ineffective in failing to move to suppress the pager, conducting an "inept cross-examination with respect to the pager," failing to object to "rank hearsay" from the arresting police officer regarding the chain of custody for the pager, making an "inadequate objection" to introduction of evidence of uncharged crimes against petitioner, and failing to request an interested witness instruction with regard to co-defendant Miranda; (2) petitioner's arrest, the seizure of the pager, and Liriano's identification all were in violation of the Fourth Amendment; and (3) petitioner was wrongfully excluded from several bench conferences during *voir dire*. For the reasons set forth below, the petition is denied.

## DISCUSSION

### Standard of Review

Clark's petition post-dates the enactment of the Anti-terrorism and Effective Death Penalty Act ("AEDPA"),[1] which modified the federal habeas statute codified in 28 U.S.C. § 2254. Pursuant to AEDPA, a petitioner seeking federal review of his conviction must demonstrate that the state court's adjudication of his federal constitutional claim resulted in a decision that was contrary to or involved an unreasonable application of clearly established Supreme Court precedent, or resulted in a decision that was based on an unreasonable factual determination in light of the evidence presented in state court. *See* 28 U.S.C. § 2254(d)(1), (2); *Williams v. Taylor*, 529 U.S. 362, 375-76 (2000).

### Analysis of Claims Raised in the Petition

---

[1] Pub. L. No. 104-132, 110 Stat. 1214 (1996).

1.      **Ineffective Assistance of Trial Counsel**

    a.      **Legal Standard**

In order to prevail on a claim of ineffective assistance of trial counsel within the framework established by the Supreme Court in *Strickland v. Washington*, 466 U.S. 668 (1984), a habeas petitioner must satisfy a two-part test. First, the petitioner must demonstrate that counsel's performance was so deficient that counsel was not functioning as "counsel" within the meaning of the Sixth Amendment to the Constitution. *Id.* at 688. In other words, the petitioner must show that his attorney's performance "fell below an objective standard of reasonableness." *Id.* Second, the petitioner must show that counsel's deficient performance prejudiced him. *Id.* at 694. To establish the "prejudice" prong of the *Strickland* test, the petitioner must show that a "reasonable probability" exists that, but for counsel's error, the outcome of the trial would have been different. *Id.* at 694.  The Supreme Court has clarified that "there is no reason for a court deciding an ineffective assistance claim . . . to address both components of the inquiry if the defendant makes an insufficient showing on one." *Id.* at 697. The reviewing "court need not determine whether counsel's performance was deficient before examining the prejudice suffered by the defendant as a result of the alleged deficiencies." *Id.* Thus, "[i]f it is easier to dispose of an ineffectiveness claim on the ground of lack of sufficient prejudice, which . . . will often be [the case], that course should be followed." *Id.*

    b.      **Alleged Grounds of Ineffectiveness**

        i.      **Failure to move to suppress pager**

Clark contends that trial counsel erred in failing to move specifically to suppress the introduction of the pager seized from him at the time of his arrest. On direct appeal, the

Appellate Division held as follows:

> Where, as here, a defendant challenges the effectiveness of counsel based on counsel's failure to make certain motions, the defendant must establish that the motions, if made, "would have been successful and that counsel otherwise failed to provide meaningful representation[.]" A single error, alone, may constitute ineffective assistance of counsel justifying a new trial, but only if it "seriously compromises a defendant's right to a fair trial[.]" Even assuming, arguendo, that a motion to suppress the pager would have been successful, we conclude that defendant failed to demonstrate that he was otherwise denied effective representation or that the failure to make that motion seriously compromised his right to a fair trial. Viewing the evidence, the law, and the circumstances of this case, in totality and as of the time of the representation, we conclude that defense counsel provided meaningful representation[.]

*People v. Clark*, 6 A.D.2d at 1067 (internal citations and quotations omitted).

Trial counsel's motion papers did seek suppression of Clark's statements to the police as the "unattenuated product of an illegal arrest" as well as suppression of "evidence illegally seized." *See* Defendant's Appellate Brief, Respondent's Exhibit D; People's Appellate Brief at 16 (citing R.1219, 1232-33),[2] Respondent's Exhibit H at 122. Counsel requested a probable cause hearing predicated upon Fourth Amendment grounds and sought "suppression of identification testimony," "suppression of statements" and "suppression of evidence/arrest," stating that the "search and seizure of the defendant were in violation of" Clark's Fourth Amendment rights. *See* R.1230-33. Trial counsel denied that Clark committed any acts which would constitute "Robbery, Criminal Possession of a Weapon, Assault, Unlawful Imprisonment or Grant Larceny."  People's Appellate Brief at 16 (citing R.1233), Respondent's Exhibit H at 122. Clark's main criticism is that counsel "failed to specify facts as to what was wrong with the search and seizure" or "what evidence he might be seeking to suppress following a probable

---

[2] Citations to "R.__" refer to the record on direct appeal in state court, submitted by respondent as part of the state court records in this case.

cause hearing[.]" Defendant's Appellate Brief at 29, Respondent's Exhibit D at 60.

In this Court's view, trial counsel was not unreasonable in assuming that these averments were particular enough to warrant a suppression hearing with respect to all of the evidence seized on the night of the incident.  The Court notes that Clark's trial counsel also specifically joined in co-defendant's counsel's motion, which sought suppression for lack of "probable cause first to detain him . . . and all evidence stemming from the lack of probable cause should fail [*sic*], which would include the identification procedure and the use of the evidence which was found at the scene. . . ." People's Appellate Brief at 17 (citing R.184), Respondent's Exhibit H at 123. Thus, trial counsel's motion to suppress did include the pager seized from Clark.

As a result of both counsels' motions, the trial court ordered a suppression hearing at which the prosecution presented evidence that Clark bailed out of a first-floor window of the house where the victim was being held. He told the police officers on the scene that "there were guys inside with guns" who "robbed him and tied him up." Defendant's Appellate Brief at 32 (quoting R.190-93), Respondent's Exhibit D at 63. The police then ordered Clark to the ground; he complied, and they patted him down. *Id.* Clark subsequently was given a "more thorough" search for weapons which revealed the pager, as well as a pocket knife and a set of keys. *Id.* Based on the evidence presented at the hearing, the trial court found that there was probable cause for Clark's arrest, that the show-up procedure was not unduly suggestive, and that Clark's statements to police were admissible. People's Appellate Brief at 17 (citing R.200-02), Respondent's Exhibit H at 123.

Although trial counsel's motion papers may have been inartfully drafted, they were not so plainly inadequate as to deprive Clark of his Sixth Amendment right to counsel. The papers

requested suppression of evidence illegally seized from Clark on the night of the incident, and

Clark was afforded a full suppression hearing. In any event, Clark was not prejudiced by trial

counsel's omission. The pager was by no means the "linchpin" of the prosecution's case against

him; there is no reasonable probability that the outcome of the trial would have been different,

even had the pager not been admitted at trial.

ii.      **Inadequate cross-examination**

Clark faults trial counsel for conducting cross-examination of one of the police officers

regarding the identification of the pager so as to allow the officer "to commit overt perjury" on

redirect examination. Petitioner's Memorandum of Law at 7 (Docket #13). On direct

examination, Liriano identified the pager introduced into evidence not by brand-name, color, or

shape, but "[b]ecause it have [*sic*] that hanger" on the back which apparently was partially

broken. T.544. On cross-examination of Officer Dominic, trial counsel engaged in the following

line of questioning:

> Q:      What proof do you have that it is Robert Liriano's pager, other than his
>         statement?
> A:      Just from what people told me.
> Q:      Were you able – I don't know if we have this technology. Are you able to
>         look at a pager, make a determination who called last? Can you bring up
>         numbers on a pager?
> A:      You could have, if you did at the time.
> Q:      Did anybody do that at the time?
> A:      I don't remember.
> Q:      But you don't have any knowledge as to whose pager that technically is,
>         correct?
> A:      Other than what I was told.
> Q:      That is through other law enforcement officers?
> A:      Officers right [*sic*].

T.516.

On re-direct examination of Dominic, the prosecutor elicited testimony from him that a

-11-

test page was performed on the pager by an unnamed "somebody." No evidence as to the result of the test page was offered into evidence; the implication was that had the prosecution had been able to prove that the test page came back positive for Liriano's number, it would have affirmatively proved that point by introducing the test results. Trial counsel then used this lack of proof regarding the test page to argue that the prosecution could not prove beyond a reasonable doubt that the pager actually belonged to the victim.

Thus, contrary to Clark's contention, trial counsel had a reasonable strategic basis for conducting the cross-examination of the police officer as he did. Furthermore, he utilized the testimony he obtained to his client's advantage on summation. The fact that, in the end, the strategy was unsuccessful does not establish that trial counsel's performance was constitutionally deficient. *See Bilzerian v. United States*, No. 96-2920, 125 F.3d 843 (table), 1997 WL 603470 at *2 (2d Cir. Sept. 30, 1997) ("Defense counsel's decisions were part of a reasonable trial strategy, that simply did not work. [On cross-examination, c]ounsel understandably tried to rebut damaging testimony, only to find their decision led to more harmful evidence. This decision does not fall below a level of reasonableness."), *cert. denied*, 527 U.S. 1021 (1999); *Dunham v. Travis*, 313 F.3d 724, 732 (2d Cir. 2002) ("Decisions about 'whether to engage in cross-examination, and if so to what extent and in what manner, are . . . strategic in nature' and generally will not support an ineffective assistance claim."); *United States v. Luciano*, 158 F.3d 655, 660 (2d Cir. 1998) ("[T]he conduct of examination and cross-examination is entrusted to the judgment of the lawyer, and an appellate court on a cold record should not second-guess such decisions unless there is no strategic or tactical justification for the course taken."), *cert. denied*, 526 U.S. 1164 (1999); *United States v. Nersesian*, 824 F.2d 1294, 1321 (2d Cir.) ("Decisions

whether to engage in cross-examination, and if so to what extent and in what manner, are similarly strategic in nature."), *cert. denied*, 484 U.S. 958 (1987). This contention therefore does not afford Clark a basis for relief.

### iii.   Failure to object to testimony regarding chain of custody of pager

Clark contends that trial counsel was ineffective in failing to object to "rank hearsay" from the arresting officers regarding the chain of custody of the pager. Officer Briggs testified that he could not be "100%" positive that the pager produced at trial was the same pager he removed from Clark's person, as he had failed to initial it at the time, but he testified that it "look[ed] like" the pager that he placed on the hood of Officer McDonald's patrol car. T.274. Officer McDonald testified that he initialed and secured the pager that had been left on the hood of his car. T.661. When the prosecutor asked McDonald how the pager had gotten there, McDonald testified that Briggs had told him that he had placed it there after searching Clark. *Id.*

Trial counsel did not object to this testimony, although he did object to the introduction of the pager on the basis that the prosecution had not established the proper chain-of-custody. Trial counsel should have objected to Officer McDonald's hearsay statement about what Officer Briggs had told him. However, even if that testimony had been stricken, it would not have made a significant difference with respect to the chain-of-custody issue since the jury still would have had before it Briggs's testimony that he placed the pager seized from Clark on McDonald's patrol car and McDonald's testimony that the pager introduced at trial was the one that he retrieved from the hood of his car. Therefore, Clark was not prejudiced by counsel's omission.

### iv.   Failure to object to introduction of uncharged crimes

Clark argues that trial counsel failed to properly object to testimony regarding his

possession of several bags of marijuana at the time of his arrest. He contends that this evidence was unduly prejudicial and had the effect of "demonizing" him in the eyes of the jury.

During the prosecution's direct case, the assistant district attorney elicited testimony from the arresting officer that, as he was about to be transported to the police station, Clark informed the officer that "he had a few bags of marijuana on him." T.245. Trial counsel objected, and a sidebar was conducted during which the trial court discussed the hearsay implications of this testimony with the prosecutor. The trial court directed that "[t]he substance of any conversations of the defendant [be] stricken" from the record. The jury also was told to "disregard" the officer's testimony on that point. T.246-47. The prosecutor was admonished to refrain from questioning witnesses in a manner that tended to elicit such hearsay statements. *Id.*[3]

When she resumed her direct examination of the officer, the prosecutor asked, "Did Mr. Clark hand anything over to you at that particular point?" T.247. The officer responded, "Five bags of marijuana." *Id.* Trial counsel's objection on the basis of relevancy was overruled. *Id.*

Clark contends that trial counsel also should have objected to the introduction of this testimony on the basis that it was unduly prejudicial and requested a ruling pursuant to *People v. Ventimiglia*, 52 N.Y.2d 350, 359, 438 N.Y.S.2d 261, 420 N.E.2d 59 (N.Y. 1981), outside the presence of the jury, to determine whether the prejudicial effect of this evidence outweighed its probative value. The Court agrees that the better practice would have been for trial counsel to request a *Ventimiglia* hearing. However, even if one had occurred, the trial court in all likelihood would have allowed the introduction of the evidence since it arguably was relevant on the issue

---

[3] Although the statement was hearsay, it arguably was admissible as an admission. *See People v. Harris*, 148 A.D.2d 469, 469, 538 N.Y.S.2d 621 (App. Div. 2d Dept. 1989) ("Any act or declaration of the accused inconsistent with his innocence is admissible as an admission[.]") (citing *People v. Bretagna*, 298 N.Y. 323, 83 N.E.2d 537 (N.Y. 1949); RICHARDSON, EVIDENCE § 212 (Prince 10th ed.)).

of motive and possibly intent; the proof at trial was that Clark and the co-defendants targeted the victim because they wanted to obtain drugs and money from. *See id.* (noting that "[a]ttempts to categorize situations in which evidence of a prior uncharged crime is admissible have yielded [the well-known listing of (1) motive; (2) intent; (3) the absence of mistake or accident; (4) a common scheme or plan embracing the commission of two or more crimes so related to each other that proof of one tends to establish the others; (5) the identity of the person charged with the commission of the crime on trial[.]") (quotations and citations omitted). While this Court might have precluded its admission upon proper objection on the basis that its probative value was substantially outweighed by the danger of unfair prejudice, the Court cannot say that had the trial court been given an opportunity to rule had an objection been proffered, it would have abused its discretion in admitting the evidence. Thus, because the outcome of the hearing is unlikely to have been favorable to him, Clark is unable to demonstrate that he was prejudiced by trial counsel's failure to make the request in the first instance.

### v.    Failure to request interested witness instruction

Finally, Clark faults trial counsel for failing to request that the trial court also charge that co-defendant Miranda was an "interested witness" as it did with respect to co-defendant Ball. First of all, contrary to Clark's contention, trial counsel did request that the trial court give several instructions with respect to determining the credibility of Miranda's testimony, namely, "benefit conferred upon a witness," "bad reputation," "prior inconsistent statements," "interested witnesses," "previously admitted false testimony," and "[i]nformer as a witness." T.595-96. Although the trial court only identified Ball as an "interested witness" in its "interested witness" instruction, it charged that Miranda was an accomplice as a matter of law. The trial court

-15-

explained that Clark could not be convicted solely on the testimony of a witness who was an

accomplice and noted that the law "view[ed] with suspicion the testimony of an accomplice in a

criminal trial . . . especially . . . where the accomplice has sought or received or been promised

some consideration in exchange for his testimony." T.694. Thus, the jury received an appropriate

instruction that it should judge Miranda's credibility in light of the fact that he was an

accomplice who had received a benefit in exchange for his testimony. Under these

circumstances, then, Clark was not prejudiced by any alleged error by trial counsel.

2.      **Fourth Amendment Claims**

        Clark contends that his Fourth Amendment rights were violated in the following ways:

his arrest was not supported by probable cause, the pager found on his person should have been

suppressed, and the victim's identification of him was inadmissible. In *Stone v. Powell*, the

Supreme Court held that "where the State has provided an *opportunity* for full and fair litigation

of a Fourth Amendment claim, the Constitution does not require that a state prisoner be granted

federal habeas corpus relief on the ground that evidence obtained in an unconstitutional search or

seizure was introduced at his trial." 428 U.S. 465, 481-82 (1976) (emphasis added). Following

*Stone v. Powell*, the Second Circuit developed a "litmus test to discern when a state prisoner has

been denied an opportunity for full and fair litigation of his fourth amendment claims." *Capellan

v. Riley*, 975 F.2d 67, 69-71 (2d Cir. 1992) (citing *Gates v. Henderson*, 568 F.2d 830 (2d Cir.

1977) (*en banc*), *cert. denied*, 434 U.S. 1038 (1978). The panel in *Gates* observed that "'all that

the [Supreme] Court required was that the state [ ] provide[ ] the *opportunity* to the state prisoner

for a full and fair litigation of the Fourth Amendment claim . . . .'" *Id.* (quoting *Gates*, 568 F.2d

at 839) (emphasis in original). The Second Circuit concluded that review of Fourth Amendment

claims presented by habeas petitioners would be undertaken in only one of two instances: (a) if

the State provided no corrective procedures at all to redress the alleged Fourth Amendment

violations; or (b) if the State has provided a corrective mechanism, but the defendant was

precluded from using that mechanism because of an "unconscionable breakdown in the

underlying process." *Id.* (quoting *Gates*, 568 F.2d 840 and citing *McPhail v. Warden, Attica

Correctional Facility*, 707 F.2d 67, 70 (2d Cir. 1983)). Notably, all that must be shown is that

the State has provided an opportunity to litigate the petitioner's Fourth Amendment claim; it

matters not whether the petitioner actually "took advantage of the State's procedure." *Graham v.

Costello*, 299 F.3d 129, 134 (2d Cir. 2002).

Clark does not contend that New York failed to provide a corrective procedure to redress

his alleged fourth amendment claim. Indeed, as the Second Circuit has noted, "the 'federal courts

have approved New York's procedure for litigating Fourth Amendment claims, embodied in

N.Y. Crim. Proc. Law § 710.10 *et seq.* (McKinney 1984 & Supp.1988), as being facially

adequate.'" *Capellan*, 975 F.2d at 70 n.1 (quoting *Holmes v. Scully*, 706 F. Supp. 195, 201

(E.D.N.Y. 1989) and citing *Gates*, 568 F.2d at 837 & n. 4; *Shaw v. Scully*, 654 F. Supp. 859, 864

(S.D.N.Y. 1987)).

Rather, Clark asserts that his Fourth Amendment claim "was not given 'full and fair

consideration' by the lower court, as the lower court failed in its job to make a fair and just

ruling on the issue[.]" Petitioner's Memorandum of Law at 14 (Docket #13).  This allegation is

not sufficient to establish that "an unconscionable breakdown" occurred in the existing process

in violation of Clark's constitutional rights. *See Capellan*, 975 F.2d at 71 ("Even if [petitioner]

were correct in his allegation that the Appellate Division erroneously decided this issue, a

-17-

petitioner cannot gain federal review of a fourth amendment claim simply because the federal court may have reached a different result.") (citing *Gates*, 568 F.2d at 839). The Second Circuit explained that reading *Stone v. Powell* as requiring the reviewing court "to focus on the correctness of the outcome resulting from the application of adequate state court corrective procedures, rather than on the existence and application of the corrective procedures themselves, . . . would be assuming, implicitly at least, that state courts were not responsible forums in which to bring constitutional claims such as is presented herein." *Capellan*, 975 F.2d at 71. According to the Second Circuit, *Stone v. Powell* "expressly discourage[d] [it] from making any such assumption." *Id.* (citing 428 U.S. at 493-94 n. 35) ("[W]e are unwilling to assume that there now exists a general lack of appropriate sensitivity to constitutional rights in the trial and appellate courts of the several States."). Thus, to the extent that Clark claims that the Appellate Division erred in its ruling, this does not give this Court the authority to review his claims "since a mere disagreement with the outcome of a state court ruling is not the equivalent of an unconscionable breakdown in the state's corrective process." *Id.* Accordingly, Clark's Fourth Amendment claims are not cognizable in this federal habeas proceeding and must be dismissed.

**3.      Exclusion of Petitioner from Sidebar Conferences During *Voir Dire***

Clark argues that he was wrongfully excluded from several sidebar bench conferences during *voir dire* in which three jurors were challenged for cause and excused based on consent of the parties. Clark is correct that a defendant in a state criminal trial "has a right to be present at all stages of the trial where his absence might frustrate the fairness of the proceedings." *Faretta v. California*, 422 U.S. 806, 819 n.15 (1975). Moreover, "[i]t is well-established that the impaneling of the jury is one such stage." *Tankleff v. Senkowski*, 135 F.3d 235, 246 (2d Cir.

-18-

1998); *accord, e.g.*, *Cohen v. Senkowski*, 290 F.3d 485, 489 (2d Cir. 2002), *cert. denied*, 537 U.S. 1117 (2003).

Under New York law, a defendant is entitled, pursuant to Criminal Procedure Law § 260.20, to be present at sidebar discussions when the merits of the case or "prospective jurors' backgrounds and their ability to weigh the evidence objectively" are discussed. *People v. Antommarchi*, 80 N.Y.2d 247, 250, 590 N.Y.S.2d 33, 35 (N.Y. 1992). However, "[f]ederal standards regarding a defendant's presence at a side bars are less stringent than New York's standards." *Nichols v. Kelly*, 923 F. Supp. 420, 426 (W.D.N.Y. 1996) (holding that a habeas petitioner's presence at each sidebar held during jury selection was not required by the United States Constitution) (citing *Gaiter v. Lord*, 917 F. Supp. 145 (E.D.N.Y.1996) ("The Federal Constitution does not require a defendant's presence at sidebar conferences."). Moreover, there is considerable authority for the proposition that Clark's claim regarding his absence during the sidebar conferences is not even a federal constitutional claim cognizable on habeas review. District courts in the Second Circuit have held that there is no right to be present at a sidebar conference during *voir dire*. *Ellis v. Phillips*, No. 04Civ.7988(SHS)(AJP), 2005 WL 1637826, at *13 (S.D.N.Y. July 13, 2005) (citing *Giles v. Kuhlmann*, No. 98-CV-7368, 2002 WL 1751401 at *4-5 (E.D.N.Y. July 11, 2002) (in turn citing *Wigfall v. Senkowski*, 1999 WL 185271 *1 (S.D.N.Y.1999); *Gaiter v. Lord*, 917 F.Supp. 145, 152-53 (E.D.N.Y.1996))[4]; *accord, e.g.*, *McKnight v. Superintendent Albauch*, 2000 WL 1072351, at *

---

[4] *See also Ellis*, 2005 WL 1637826, at *13 (citing, *inter alia*, *Sanchez v. Burge*, 04 Civ. 2622, 2005 WL 659195 at *3 (S.D.N.Y. Mar. 22, 2005) ("Here, petitioner fails to cite to any federal statute or Supreme Court precedent holding that a petitioner has a right to be present at sidebar conferences during voir dire. *Antommarchi* is a state law rule and does not entitle petitioner to federal habeas corpus relief."); *Perez v. Greiner*, 00 Civ. 5504, 2005 WL 613183, at *5-6 (S.D.N.Y. Mar. 14, 2005) ("Although the pre-screening and impaneling of jurors is a material stage of trial at which a defendant has a constitutional right to be present, there is no clear Supreme Court precedent

(S.D.N.Y. Aug. 2, 2000); *United States v. Feliciano*, 223 F.3d 102, 111 (2d Cir. 2000) (finding

no case "in which an appellate court has found a structural defect where a defendant was present

throughout but unable to hear a circumscribed portion of *voir dire*, and whose counsel was

allowed to consult with him about the limited questioning outside his hearing"), *cert. denied*, 532

U.S. 943 (2001); *Perez v. Greiner*, 00 Civ. 5504, 2005 WL 613183 at *5-6 (S.D.N.Y. Mar. 14,

2005) ("Although the pre-screening and impaneling of jurors is a material stage of trial at which

a defendant has a constitutional right to be present, there is no clear Supreme Court precedent

supporting a claim that absence from a sidebar conference during voir dire violates the Sixth

Amendment. Therefore, the Appellate Division's adjudication of this claim is not contrary to, or

an unreasonable application of, that law.") (citations omitted); *Diaz v. Herbert*, 317 F. Supp.2d

462, 473 (S.D.N.Y. 2004) ("[E]ven if [petitioner's] rights under *Antommarchi* were violated, it

does not rise to the level of a federal constitutional violation. Therefore, any alleged violation of

these rights is not cognizable on habeas review.").

In two recent cases, the Court of Appeals for the Second Circuit has held that, if the right

to be present at sidebar conferences during voir dire exists, it is subject to harmless error

---

supporting a claim that absence from a sidebar conference during voir dire violates the Sixth Amendment. Therefore, the Appellate Division's adjudication of this claim is not contrary to, or an unreasonable application of, that law.") (citations omitted); *Diaz v. Herbert*, 317 F. Supp.2d 462, 473 (S.D.N.Y. 2004) ("[E]ven if [petitioner's] rights under *Antommarchi* were violated, it does not rise to the level of a federal constitutional violation. Therefore, any alleged violation of these rights is not cognizable on habeas review."); *Dickens v. Filion*, No. 02 Civ. 3450(DLC)(AJP), 2002 WL 31477701, at *9 (S.D.N.Y. Nov. 6, 2002); *Persaud v. Mantello*, 99 CV 1861, 2002 WL 1447484, at *2 (E.D.N.Y. July 2, 2002) ("[D]istrict courts in this circuit have held that there is no right to be present at a sidebar conference during voir dire") (citing cases); *Johnson v. McGinnis*, 99 Civ. 11231, 2001 WL 740727, at *3 (S.D.N.Y. June 29, 2001) ("The right to be present at sidebar during *voir dire* derives from New York state statutory law. Since a federal court on habeas review is limited to considering only violations of the federal Constitution or federal statutory law, I am procedurally barred from considering this claim.") (citations omitted); *Bryant v. Bennett*, 2001 WL 286776 at *3 (holding that the federal constitution does not require a defendant's presence at a voir dire sidebar); *Benitez v. Senkowski*, No. 97 Civ. 7819(DLC), 1998 WL 668079, at *4 (S.D.N.Y. Sept. 17, 1998) ("However, there is no Constitutional right to appear at sidebar conferencing for peremptory challenges; at most, there is a more limited right to presence during the formal exercise, in open court, of peremptory jury challenges.") (citing cases).

analysis. *Sanchez v. Duncan*, 282 F.3d 78, 81 (2d Cir. 2002); *United States v. Feliciano*, 223 F.3d 102, 110 (2000), *cert. denied*, 532 U.S. 943 (2001). In *Sanchez*, the Second Circuit explicitly declined to resolve the issue the question, holding that there was "no need for [it] to decide whether Sanchez in fact had a "clearly established" federal constitutional right to be present at the voir dire sidebars in this case[.]" 282 F.3d at 83 n.4.

In any event, even if the right to be present at sidebar conferences were a cognizable federal constitutional claim, it is subject to waiver, as long as the waiver is knowing and voluntary. *Ellis*, 2005 WL 1637826, at *13 (citing, *inter alia*, *Cohen v. Senkowski*, 290 F.3d 485, 491, 492 (2d Cir. 2002)). The waiver of the right to be present may be made by the defendant himself or by defense counsel, id. (citing, *inter alia*, *Polizzi v. United States*, 926 F.2d 1311, 1322 (2d Cir. 1991)), and may be inferred from a defendant's conduct, such as the failure to contemporaneously object, *id.* (citing, *inter alia*, *Cohen v. Senkowski*, 290 F.3d at 491, 492 ("when a defendant is fully apprised of the nature of the [sidebar] procedure, makes no objection to the procedure, and has counsel present for the duration of the [sidebar procedure], a knowing waiver of the right to be present occurs.") (citing cases); *United States v. Torres*, No. 98-1075, 98-1115, 98-1372, 199 F.3d 1324, 1999 WL 1022488 at *2 (2d Cir. Oct. 25, 1999), *cert. denied*, 531 U.S. 1170 (2001); *Perez v. Greiner*, 2005 WL 613183 at *5-6 ("[E]ven if counsel for the defendant did not waive the defendant's right to be present, if the defendant was present in the courtroom during sidebar conferences and knew that the conferences were taking place, his failure to assert his right to be present at the time amounts to a waiver."); *Pellington v. Greiner*, 307 F. Supp.2d. 601, 605 (S.D.N.Y. 2004) (holding that "a waiver [to be present at any stage of the criminal proceeding] may be implied by a defendant's conduct."); *Rodriguez v. Herbert*, No.

02-CV-895, 2004 WL 1125431 at *6 (E.D.N.Y. May 20, 2004) ("Although trial courts must vigorously safeguard a criminal defendant's right to be present, a defendant may expressly or effectively waive the right. . . . Tellingly, [petitioner] did not object when the sidebar conference occurred outside his presence. Therefore, as it is reasonable to conclude that Rodriguez understood what was going on and that he had a right under New York law to be present at sidebar, the likely explanation for his absence is that he and his lawyer [ ] did not think it was important for him to be present at the sidebar conference.") (citations & quotation marks omitted)). Such appears to have been the case here; Clark personally made no objection to the procedure that can be gleaned from the record and his trial counsel was present during each sidebar in question. Accordingly, this claim provides no basis for habeas relief.

## CONCLUSION

For the reasons stated above, petitioner Danny Clark's petition for a writ of habeas corpus pursuant to 28 U.S.C. § 2254 is denied, and the petition is dismissed.  Because petitioner has failed to make a substantial showing of a denial of a constitutional right, I decline to issue a certificate of appealability. *See* 28 U.S.C. § 2253.

**IT IS SO ORDERED**

/s/ *Victor E. Bianchini*

_____
          VICTOR E. BIANCHINI
          United States Magistrate Judge

DATED:        July 21, 2006
              Rochester, New York.